UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER VERSOSKY,

    Plaintiff,

v.

PAUL DUTRA,

    Defendant.

Case No. 2:23-cv-11061

Hon.
Mag.

---

Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter, PLLC
*Counsel for Plaintiff*
105 E. Main Street
Northville, MI 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

---

## COMPLAINT AND JURY DEMAND

Plaintiff Amber Versosky, through her attorneys Salvatore Prescott Porter & Porter, brings this Complaint for defamation and intentional infliction of emotional distress.

## PARTIES, VENUE AND JURISDICTION

1. Plaintiff resides within the Eastern District of Michigan.

2. Defendant Paul Dutra resides in Florida and serves as Executive Vice President of a pharmaceutical company, Ingenus, that is licensed in Michigan and

does business in Michigan.

3. The parties have diverse citizenship.

4. The amount in controversy exceeds $75,000.00.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

6. Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the proper venue as this is the judicial district in which Plaintiff resides and works and where the professional and personal reputational harm caused by Defendant's defamatory remarks occurred.

## GENERAL ALLEGATIONS

7. Plaintiff and Defendant are both high-level health care executives who work in the same small specialty area of generic pharmaceuticals.

8. Plaintiff is the President of Auburn Pharmaceutical, a generic drug distributor based in Rochester Hills, while Defendant is an Executive Vice President of Ingenus, a Florida-based pharmaceutical company that is licensed to do business in Michigan.

9. Plaintiff's husband, Tom Versosky, and her brother-in-law, Bill Versosky, are also professionals in the same small business community; Tom is the President of a company that helps shepherd generic drugs to market and Bill is the CEO of a wholesale distribution company that partners with independent pharmacies.

10. As one of the few women executives in the industry, Plaintiff is highly visible. She spent decades climbing the ladder and has worked hard to develop her reputation as a knowledgeable and effective industry leader.

11. As with any small professional industry, personal relationships play a significant role in business success; trade conferences provide an opportunity for members of the professional community to share best practices, network, and build relationships. Reputation matters.

12. On or about October 24, 2021, both Defendant Paul Dutra and Plaintiff's brother-in-law, Bill Versosky, attended a professional trade conference, hosted by a company called OptiSource, at the Ritz Carlton Hotel in Santa Barbara, California.

13. At some point during the conference, Defendant struck up a conversation with Bill.

14. Also present were two of Bill's employees – Vicki Mangus, VP of Sales at SecondSource Rx and Darrin Hoenig, VP of Purchasing at SecondSourceRx – as well as one of Defendant's employees, Stephanie Usalj, VP of Sales and Marketing at Ingenus Pharmaceuticals.

15. Bill mentioned to Defendant that Defendant had probably met his sister-in-law, Plaintiff.

16. Defendant responded that not only did he know Plaintiff; he had

3

"fucked" her.

17. Defendant's comment did not appear to be made in jest, nor was it interpreted by any of the listeners as a joke or puffery.

18. Ms. Usalj chided Defendant, saying something along the lines of, "I can't believe you told him that!"

19. Indeed, Bill took the comment to heart and was devastated by his belief that his sister-in-law had apparently cheated on his brother.

20. Bill did not divulge to his brother what he had learned from Defendant, but he began acting coldly toward Plaintiff in the aftermath of Defendant's comment, which puzzled Plaintiff.

21. Approximately one year later, on or about October 25, 2022, there was another OptiSource industry vendor meeting – this time at the Ponte Vedra Inn in Ponte Vedra, Florida – that Bill and Defendant again attended.

22. Defendant asked Bill how Plaintiff was doing, and Bill responded that he and Plaintiff hadn't been talking.

23. Upon hearing this, Defendant and Ms. Usalj were eager to share "some stories" about Plaintiff, but Bill told them to stop talking about her.

24. Approximately four months later, on or about February 27, 2023 at the Renaissance Dallas Addison Hotel in Addison, Texas, Defendant attended a Generic Rx conference hosted by a company called ECRM.

25. While there, Defendant was once again in conversation with Ms. Usalj, Vicki Mangus, and Darrin Hoenig.

26. Ms. Usalj brought up the October 2021 meeting and the fact that Defendant had said at the time that he had slept with Bill Versosky's sister-in-law, Plaintiff Amber Versosky. Defendant replied "yeah, twice," in reference to the number of times he had purportedly slept with Plaintiff.

27. At the time of these statements, Plaintiff had never even met Defendant, let alone had a sexual relationship with him. Defendant's statements to the contrary were completely untrue.

28. Ms. Mangus let her colleague, Bill Versosky know that Defendant was once again bragging about having sex with his sister-in-law, and now claimed to have slept with her twice. Bill then shared what he had heard with his brother, Tom Versosky – Plaintiff's husband.

29. Upon returning home from work on March 10, 2023, Plaintiff found her husband in tears, demanding to know if she had been unfaithful.

30. The defendant's false statements were particularly upsetting for Plaintiff's husband, because his first marriage had ended because of his ex-wife's infidelity.

31. Despite Plaintiff's reassurances that she had not only never slept with Defendant, but that she had never even met him, the defamatory statements by

Defendant caused a rupture in Plaintiff's relationship with both her husband and her brother-in-law.

32. Plaintiff felt sick to her stomach; she lost her appetite and couldn't sleep, as she wondered which other industry professionals and colleagues had heard (and accepted as true) Defendant's false claims that he had slept with her.

33. Plaintiff sent an email to Defendant the same day that her husband told her about Defendant's comments. Plaintiff introduced herself, expressed disgust at Defendant's comments and demanded that he retract them. (*See* email at Exhibit A).

34. Defendant responded by writing: "I am so sorry to receive this email, and would like the opportunity to speak with you regarding this email. Please let me know if you are comfortable speaking with me and a time that we could connect on the phone." *Id.*

35. Plaintiff responded that she had no interest in speaking with Defendant. Defendant later responded that he spoke with both Tom and Bill "and confirmed that we have never met. I have given them my sincere apologies, and I would like to apologize to you here, as well as live if you would be comfortable speaking with me." *Id.*

36. Defendant also sent a text message to Plaintiff's husband, requesting an opportunity to apologize in person at an upcoming conference, writing "I am so sorry for putting you guys through this." (Text message attached as Exhibit B).

6

37. On information and belief, Defendant has not made a full retraction of his false statements as he has not communicated with others who heard the statements, including at minimum Ms. Usalj, Vicki Mangus, and Darrin Hoenig, to retract the false statements.

## COUNT I
## DEFAMATION - SLANDER PER SE

38. Plaintiff incorporates here all previously stated allegations.

39. On repeated occasions, Defendant made false and damaging statements claiming that he had had sexual relations with Plaintiff, a married woman and senior executive in the same professional community as Defendant.

40. In doing so, Defendant imputed a lack of chastity on Plaintiff, a married woman.

41. The false statements were published and republished to a third-party audience of industry professionals on multiple occasions, including to Plaintiff's own brother-in-law.

42. Defendant knew his statements were false and/or acted in reckless disregard of their truth or falsity.

43. Defendant's statements were not privileged.

44. Though the comments constituted slander per se (and therefore are actionable even in the absence of special harm), they also caused special harm in the form of damage to Plaintiff's professional reputation, along with emotional distress

7

and marital/familial instability.

45. Plaintiff requested a retraction of the false and defamatory statements made about her but, to date, Defendant has only confessed to the falsity of the statements to one of the four people who heard him utter them.

46. As a direct and proximate result of the Defendant's actions, Plaintiff has sustained injuries and damages including, but not limited to, damage to Plaintiff's reputation in the community; loss of earnings and earning capacity; mental and emotional distress including anxiety and mental anguish; humiliation and embarrassment; reputation, spiritual and familial distress; and the loss of the ordinary pleasures of everyday life.

47. Because Defendant's statements imputed on Plaintiff a lack of chastity, the statements constitute defamation per se.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

48. Plaintiff incorporates here all previously stated allegations.

49. Defendant's conduct as outlined above was intentional or reckless.

50. Defendant's conduct was extreme, outrageous and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society. It was not for any proper purpose.

51. Defendant's conduct caused the severe and serious emotional distress

of Plaintiff.

52. Defendant's conduct in this matter, which proximately caused Plaintiff's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for Plaintiff's physical and emotional well-being.

53. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained injuries and damages including, but not limited to, damage to Plaintiff's reputation in the community; loss of earnings and earning capacity; mental and emotional distress including anxiety and mental anguish; humiliation and embarrassment; reputation, spiritual and familial distress; and the loss of the ordinary pleasures of everyday life.

54. Defendant's conduct deliberately and intentionally injured Plaintiff; his acts were willful and malicious.

## **RELIEF REQUESTED**

Plaintiff seeks all available relief, including but not limited to:

    a. compensatory damages;

    b. punitive damages;

    c. attorneys' fees and costs;

    d. and all other relief, equitable and otherwise, allowed by law and deemed appropriate by the judge or jury.

Dated: May 4, 2023

Respectfully submitted,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Attorneys for Plaintiffs
105 East Main Street
Northville, MI 48167
(248) 679-8711
Salvatore@spplaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER VERSOSKY,

      Plaintiff,

v.

PAUL DUTRA,

      Defendant.

Case No. 2:23-cv-11061

Hon.
Mag.

Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter, PLLC
*Counsel for Plaintiff*
105 E. Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
fegley@spplaw.com

## JURY DEMAND

Plaintiff demands a jury trial in the above-captioned matter.

      Respectfully submitted,

      SALVATORE PRESCOTT
      PORTER & PORTER, PLLC

      /s/ Jennifer B. Salvatore
      Jennifer B. Salvatore (P66640)
      David L. Fegley (P85275)
      *Attorneys for Plaintiffs*
      105 East Main Street
      Northville, MI 48167

Dated: May 4, 2023

      (248) 679-8711
      Salvatore@spplaw.com